UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| GARY M. MURPHEY, Liquidating Agent for SOUTHEAST WAFFLES, LLC, EZELL, LLC, J.C. EZELL, LLC, EEE, LLC AND W.C. EZELL, LLC,<br><br>Plaintiffs,<br><br>vs.<br><br>LATTIMORE, BLACK, MORGAN & CAIN, P.C.,<br><br>Defendant. | Case No.:<br>JURY DEMAND |

## COMPLAINT

Gary M. Murphey as Liquidating Agent for Southeast Waffles, LLC ("Murphey"), and Ezell, LLC, J.C. Ezell, LLC, EEE, LLC and W.C. Ezell, LLC (collectively, "Ezell"), complain against Lattimore, Black, Morgan & Cain, P.C. ("LBMC") as follows:

## SUMMARY

This is a suit for damages by a bankruptcy estate and some creditors of the estate who relied to their detriment on LBMC's audit of the financial statements of now-bankrupt Southeast Waffles, LLC (referred to in this Complaint as "Southeast Waffles" or the "Company"). LBMC owed Southeast Waffles, and those it knew were relying on its work, a professional duty of care. Instead, LBMC grossly failed in that duty, because (among other reasons):

LBMC's own workpapers reveal that LBMC knew from its prior-year audits that there were significant violations of Federal tax and trust law, warning signs of fraud, and payroll tax checks to the Internal Revenue Service (the "IRS") held in drawers, and that the company presented a "fraud risk."

22468 v11

Case 3:10-cv-00490   Document 1   Filed 05/20/10   Page 1 of 20 PageID #: 1

Even with that knowledge, LBMC chose or approved financial reporting methods that, among other things, misrepresented tax-law violations by an amount not less than $700,000.00, misrepresented that the company paid its federal tax liabilities timely, and swept over two-thirds of the amount of these violations into the vague and benign-sounding category of "checks in excess of cash." LBMC in fact helped whitewash the wrongdoing by understating those amounts for two consecutive years. Further, LBMC omitted to disclose its choice to obscure this financial reporting.

Moreover, LBMC:

- never even bothered to consider the effect of federal tax penalties;
- blindly accepted unverified statements from the very person it then knew was not truthful about the company's finances;
- never bothered to check those statements; and
- never clearly "reported up" or "out" in any way that could or would reasonably alert those LBMC knew were relying upon its professional work, standards, and judgment.

In any event, these Plaintiffs, including the Company (whose rights are here pursued by Murphey) reasonably relied on LBMC's professional services and now sue to the recover the damages LBMC caused them.

### I. THE PARTIES.

1. Plaintiff Gary M. Murphey is the Liquidating Agent for Southeast Waffles, pursuant to the First Amended Chapter 11 Plan filed by the Company and confirmed by the Bankruptcy Court for the Middle District of Tennessee on September 30, 2009, and therefore has standing to file this action. Prior to his appointment as Liquidating Agent, Murphey was the Chief Restructuring Officer for Southeast Waffles throughout much of the bankruptcy case.

2. Plaintiffs Ezell, LLC, J.C. Ezell, LLC, EEE, LLC and W.C. Ezell, LLC are creditors of Southeast Waffles, having lent the Company money at its inception, and therefore

have standing to file this action. In addition, they were damaged by the actions of Defendants as they relied on the audit opinions issued by LBMC in making continuing, additional decisions to their detriment with respect to this debt.

3.	Defendant Lattimore, Black, Morgan & Cain, P.C. is a Tennessee professional corporation and public accounting firm with headquarters in Brentwood, Tennessee. LBMC's registered agent for service of process is David K. Morgan, 5250 Virginia Way, Brentwood, Tennessee 37027.

## II. JURISDICION AND VENUE.

4.	Jurisdiction over this matter and over the Defendants is proper in this district, pursuant to 28 U.S.C. § 1334(b). The claims giving rise to this action are related to the bankruptcy case of Southeast Waffles, which was filed in the Middle District of Tennessee on August 25, 2008.

5.	Venue over this matter is proper in this district, pursuant to 28 U.S.C. § 1391(a)(1) and/or (2). Defendant is domiciled in this judicial district and the events and/or omissions giving rise to this lawsuit occurred within this judicial district.

6.	Venue is also proper pursuant to 28 U.S.C. § 1409(a), because the bankruptcy of Southeast Waffles was filed and administered in this judicial district.

## III. THE FACTS.

**A.	Southeast Waffles and Its Business Background.**

7.	In or about 1974, Nat Harris and William E. Ezell, III formed TreeTop Enterprises, Inc. ("TreeTop") for the purpose of purchasing and operating Waffle House restaurants in Tennessee and surrounding states.

8.	In April 1999, TreeTop sold its Waffle House franchise rights to Southeast Waffles, which was owned by James Shaub ("Shaub"), an employee of TreeTop.

9. As part of the sale, Southeast Waffles executed a promissory note of roughly $6,400,000 in favor of TreeTop.

10. At the time of the sale to Southeast Waffles, TreeTop was owned by Mr. William E. Ezell, III and his three children, Lissa Ezell, Clay Ezell and Jeffrey Ezell.

11. TreeTop subsequently assigned the promissory note to the plaintiff limited liability companies (LLCs), which are LLCs created by and for Mr. Ezell and his children.

12. Southeast Waffles operated approximately 113 Waffle House restaurants, primarily along the I-65 corridor in Tennessee and Alabama, with additional locations in Mississippi and Kentucky, and employed over 2,000 employees prior to its bankruptcy.

13. Southeast Waffles was not subject to federal income taxes because it was a limited liability company and therefore a passthrough entity for federal income tax purposes. It was, however, responsible for calculating and remitting other types of taxes, including federal trust fund taxes on payroll and the information returns associated therein.

14. Pursuant to the Asset Purchase Agreement between TreeTop and Southeast Waffles, Southeast Waffles was required to provide audited financial statements to the note holders each year during which any of the debt evidenced by the note remained outstanding.

15. LBMC conducted the audits contemplated by the Asset Purchase Agreement and provided its opinion with the financial statements to Southeast Waffles, which in turn, provided it to Ezell.

16. On or about August 25, 2008, Southeast Waffles filed its bankruptcy case in Nashville, being case number 08-07552.

17. On September 30, 2009, the Chapter 11 Plan was confirmed in the bankruptcy case and the Company is in the process of being liquidated.

## B.    2005-2006 Audits:  LBMC is Alerted to Problems.

18.    Rebecca Sullivan ("Sullivan"), Southeast Waffles' chief financial officer, was LBMC's point of contact with respect to the audits it conducted of Southeast Waffles' financial statements.

19.    Sullivan was responsible for compiling and providing to LBMC the information it needed to begin and complete its audit.

20.    Sullivan was also responsible for the payment of trust fund taxes, arising from funds withheld from employees' pay and held in a statutory trust for the benefit of these employees at retirement.

21.    Sullivan was the only person employed by the Company who received and reviewed correspondence from the IRS.

22.    The auditors, through their procedures, became aware of inconsistencies in the bank reconciliations.  Notably, checks payable to the IRS remained uncashed for weeks and sometimes even months after they were issued by the Company.

23.    When asked about outstanding checks (checks that were written on Southeast Waffles' books but had not yet cleared Southeast Waffles' bank account), Sullivan represented to the auditors that once the checks had been issued, they were sent to the recipient and therefore must not have been cashed as of the date of the reconciliation.

24.    The auditors took Sullivan at her word, did not investigate further, and did not question any other accounting staff as to policy or procedure.  "Q: And where did you get that understanding?  A: From Ms. Sullivan.  Q: From anybody else?  A: No."  Examination of LBMC audit partner pursuant to Federal Rule of Bankruptcy Procedure 2004, at page 31.

22468 v11                                                              5
Case 3:10-cv-00490   Document 1   Filed 05/20/10   Page 5 of 20 PageID #: 5

25. The Company, under the control of Sullivan, consistently held checks and failed to remit trust fund taxes to the IRS on a timely basis, incurring large penalties from the government for failure to remit trust fund taxes and violating federal trust fund law.

26. LBMC was aware of the check holding as early as 2005. "Q: So there's an understanding that checks are being held in '05, that same process of putting checks in the drawer? A: Right." Exam LBMC audit partner, page 63.

27. The 2005 financial statements reflect the creation of a new category, "checks written in excess of bank balance," in the liabilities portion of the balance sheet. This liability classification did not exist prior to the 2005 audit and there is no footnote explaining the category or what it reflects.

28. However, Sullivan represented to LBMC that no vendor checks were held in 2006, which LBMC took at face value. "Q: [Y]ou knew in '06 that wasn't the case, right – due to your follow-up in '06, that turned out not to be true? A: It did not appear to be." Exam LBMC audit partner, page 64.

29. Additionally, accrued payroll taxes, as reflected in the notes to the financial statements, dropped from $799,654 in 2005 to $317,747 in 2006, which should have alerted LBMC that something was going on with respect to the remittance and payment of payroll taxes. There is no footnote explaining this dramatic decrease.

30. Notwithstanding the red flags surrounding the bank reconciliations and the corresponding trust fund taxes, LBMC simply reclassed outstanding checks to the generic "checks written in excess of bank balance" account and issued an unqualified audit opinion.

31. In fact, the notes to the financial statements suggest that the Company was improving financially.

### C. The 2007 Audit

32. Southeast Waffles, under the direction of Sullivan, continued its practice of holding checks and failing to remit trust fund taxes throughout fiscal year 2007, causing it to fall further and further behind with its creditors and incurring substantial penalties with the IRS.

33. Sullivan continued to represent to LBMC that trust fund taxes and other accounts were current throughout the 2007 audit. However, a review of the bank reconciliations should have alerted LBMC to the fact that IRS checks were still not being cashed in a timely fashion and, therefore, that such checks likely were not being paid at all.

34. As in 2006, LBMC took Sullivan at her word and did not conduct further investigation into the issue, even though they knew Sullivan's representations to be false and knew that they had a duty to take action. "Q: And when you suspected truthfulness of the CFO for purposes such as these, do you have a duty to take those to the owner or the manager or whoever is superior to that person? A: I think so." Exam LBMC audit partner, page 93.

35. The LBMC audit partner in charge of the financial statement audit of the Company knew that the IRS checks were being held and that the IRS was not being paid. In fact, the LBMC audit partner sent at least one e-mail to Sullivan asking if she was "still having to hold payroll cash deposit checks" in the course of the 2007 audit.

36. However, LBMC intentionally did nothing more to disclose this issue in the financial statements. "Q: [Having] realized that payroll taxes were understated on the '06 return, did you do anything to correct this in the '07 audit? A: Again, it's included in current liabilities." Exam LBMC audit partner, page 69.

37. As in 2006, LBMC simply reclassified all outstanding checks to the "checks written in excess of bank balance" account and issued an unqualified audit opinion.

38. By intentionally including the payroll taxes in this generic liability category, LBMC buried and hid the tax liability in such a way that persons reviewing the financial statements were misled as to the financial condition of the company.

39. As in 2006, there are no notes to the financial statements explaining what "checks written in excess of bank balance" means, what kinds of checks might be included, or addressing accrued or accruing interest or penalties.

40. The audited financials for 2007 suggest that the cash flows and overall position of Southeast Waffles had improved from the prior year, when in fact the Company's financial position was precarious at best.

**D.  LBMC's Willful Blindness to Known Wrongdoing.**

41. LBMC noted in its own audit workpapers that Southeast Waffles had a history of not timely paying its trust fund taxes. Accordingly, LBMC should have expanded its audit testing to ensure that SEW was in compliance with its federal obligations, including requesting confirmation of payment from the IRS, a simple procedure.

42. However, LBMC never sought communication directly with the IRS. Instead, the audit procedures used by LBMC primarily tested payments after fiscal year end, which provided little assurance that amounts owed during the period in question were paid.

43. Further, IRS payments on LBMC workpapers shown as "paid" from several periods prior to year end were actually still included on the outstanding check list. LBMC could have easily identified that issue, which would indicate payroll taxes were not being paid. "Q: So this – this reconciliation which is designed to show you those checks have cleared, in fact that didn't happen? A: Correct. I was misled by this. Q: Right. And you could have asked for

canceled checks? A: Yes. Q: Okay. And you did not. A: I did not." Exam LBMC audit partner, page 79.

44. LBMC continued to accept the unverified representations of Sullivan as truth when it knew them to be false, with no follow-up. "Q: [Was] there any follow-up to determine whether those checks were in the drawer or uncleared, meaning issued and delivered in the bank system somewhere? A: We didn't determine that to be necessary." Exam LBMC audit partner, page 38.

45. LBMC's audit procedures were woefully inadequate, as LBMC missed the real payroll tax liability by over $700,000. "Q: When did you know that the actual payroll tax accrual was closer to a million dollars, by your testimony, instead of 268,081? A: I mean, I knew it was included in the checks written in excess of bank balance when these financial statements were issued in December of 2007." Exam LBMC audit partner, page 70.

46. LBMC chose to ignore the warning signs and continued to issue unqualified audit opinions.

E. **LBMC's Decisions Helped Hide the Wrongdoing from Others.**

47. LBMC did not investigate any of the issues in accordance with generally accepted auditing standards and did not notify Shaub or others that there were issues regarding the trust fund taxes.

48. LBMC chose to ignore the warning signs and information it knew to be false, and continued to issue unqualified audit opinions with Southeast Waffles' financials.

49. Because LBMC did not properly classify the balances on the financial statements, persons relying on these statements could not determine that withholding taxes had not been paid for several months.

22468 v11                                        9
Case 3:10-cv-00490   Document 1   Filed 05/20/10   Page 9 of 20 PageID #: 9

50. Therefore, the audited financials understated accrued and withheld trust fund taxes significantly.

51. These problems continued and magnified as time passed, even as the financial statements indicated that the company was improving financially.

52. LBMC's audit opinions clearly state that it was of the opinion that Southeast Waffles' financial statements "present fairly, in all material respects, the assets, liabilities, and members' deficit of Southeast Waffles, LLC." No qualifications to the opinion were provided with respect to the trust fund taxes.

### F. Southeast Waffles, Its Estate and Certain Creditors Relied on LBMC

53. Southeast Waffles relied on these audited financials to conduct business and make decisions.

54. LBMC was aware that the Company relied on the audit report to determine the position of its business and its financial health.

55. Plaintiff Ezell also relied on these financials to make lending and credit decisions with respect to the administration of their loan and agreed to extend the subordination of its debt to that of First Bank, a secured lender of Southeast Waffles after reviewing the 2006 audit report.

56. LBMC was aware of Ezell's reliance and of the debt subordination between Ezell and First Bank and the notes to the financial statements reflect this knowledge. "The note payable to TreeTop Enterprises, Inc. is subordinated to the [First Bank] Credit Agreement."

### G. Southeast Waffles' Bankruptcy and Discovery of the Wrongdoing.

57. LBMC knew that Sullivan, the chief financial officer for Southeast Waffles, was untruthful and that her unsanctioned conduct was not in the best interest of the Company.

22468 v11

10

Case 3:10-cv-00490   Document 1   Filed 05/20/10   Page 10 of 20 PageID #: 10

58. Even with that knowledge, LBMC supported and/or sanctioned the resulting misstatement of the Company's financial condition.

59. In early August 2008, Sullivan disappeared without notice, taking her Company-issued laptop computer, her personal expense reports, and the Company's tax files. Shaub attempted to contact Sullivan on numerous occasions without success, only to receive a letter from her attorney stating that she was not to be contacted.

60. On August 8, 2008, First Bank informed Shaub that a suspicious pattern of deposits and withdrawals had developed in Southeast Waffles' checking account; subsequently, Shaub learned that these suspicious transactions appeared to evidence a check-kiting scheme between Company accounts at SunTrust Bank and First Bank, which were under the control of Sullivan.

61. On August 11, 2008, the Internal Revenue Service informed Shaub that the Company was seriously delinquent with respect to its trust fund tax obligations.

62. Shaub then learned that Southeast Waffles owed the Internal Revenue Service more than $1,000,000.00 in trust fund taxes at the time of Sullivan's departure, plus penalties and interest.

63. On August 21, 2008, Waffle House, Inc., the franchisor of Southeast Waffles' restaurants, purported to terminate Southeast Waffles' franchise agreements by letter to Shaub.

64. The culmination of all these events led to the bankruptcy filing on August 25, 2008.

## IV. LBMC'S DUTIES

65. The standard of care applicable to the conduct of audits by public accountants is that of reasonable care and competence.

66. LBMC owes its employers, like Southeast Waffles, many legal and contractual duties. Among them, LBMC owed Southeast Waffles the legal duty to make reports without fraud and the contractual duty to make them under the terms of the contract with care and caution required by the standards of their profession.

67. Accounting firms in Tennessee are also liable for pecuniary loss caused by their failure to exercise reasonable care or competence in supplying correct information to persons who are intended recipients of the information.

68. Southeast Waffles and Ezell were intended recipients of the information supplied by LBMC in its audit opinion.

69. Accounting firms must conduct audits in accordance with generally accepted auditing standards ("GAAS"). The Auditing Standards Board issues Statements on Auditing Standards ("SAS") that establish standards and provide guidance with respect to fulfilling and meeting these standards.

70. SAS No. 1, "Codification of Auditing Standards and Procedures," provides that "auditor[s] [have] a responsibility to plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether caused by error or fraud."

71. SAS No. 99, "Consideration of Fraud in a Financial Statement Audit," provides auditors with guidance on how to plan and perform audits to "[fulfill] that responsibility, as it relates to fraud, in an audit of financial statements conducted in accordance with GAAS."

72. SAS No. 99 also outlines and discusses important items that auditors must consider when determining if fraud exists, including the importance of professional skepticism,

evaluation of internal controls, communication with management, and documentation of this consideration.

73. The procedures outlined in SAS No. 99 are designed to be integrated into the overall audit process.

74. The LBMC audit partner was fully aware of Sullivan's pattern of not paying trust fund taxes timely and the reclassification of the IRS checks into the generic catch-all category. "Q: [The] IRS was not getting paid? A: Yes." Exam LBMC audit partner, page 43.

75. However, the audit team under his guidance did nothing to notify Shaub or others of these issues, even as their workpapers indicated problems with Southeast Waffles' financial statements.

76. The LBMC audit partner was also aware that failure to remit trust fund taxes violated federal law, but failed to notify or have his audit team notify anyone regarding this, including Shaub, the IRS or the hundreds of employees who had withholding taken from their paychecks that was then misappropriated by Sullivan. "Q: Did you have a duty to do that? A: I think I had a responsibility to do that." Exam LBMC audit partner, page 94.

77. Paragraphs 79-82 of SAS No. 99 provide guidance to auditors on communicating about possible irregularities, misstatements, or fraud to management, the audit committee and others.

78. In the case of fraud by senior management, such as Sullivan, Paragraph 79 instructs the auditor to report these findings directly to the audit committee. As the Company had no audit committee, LBMC should have notified Shaub directly of these issues.

79. LBMC knew that Shaub delegated financial decisions to Sullivan and did not take an active role in the financial operations of Southeast Waffles. "I didn't observe him being very involved in the financial operations." Exam LBMC audit partner, page 131.

80. "Q: And did Lattimore ever go to Mr. Shaub and say, we're getting information from Ms. Sullivan that is not credible? A: I don't have any evidence of that, and I don't recall." Exam LBMC audit partner, page 93.

81. Instead, LBMC chose to issue what they deemed a "management representation letter" to Shaub and Sullivan, the very person committing the acts that damaged the Company, its employees and Ezell.

82. The management letter LBMC wrote on behalf of Southeast Waffles represents that "[the] Company is paying its accounts payable, sales taxes and payroll taxes in a timely manner," even though LBMC knew this to be false. "Q: [Knowing] that that wasn't true, that she was not credible on the issue, correct? A: Yes." Exam LBMC audit partner, page 94.

## V. COUNT ONE: MURPHEY'S CLAIM FOR MALPRACTICE

83. Murphey repeats and realleges the allegations in paragraphs 1-82 above.

84. Section 108(a) of the Bankruptcy Code provides that, if a statute of limitations has not expired prior to the date of the filing of the petition, that the trustee may commence such action before the later of the "end of such period, including any suspension of such period occurring on or after the commencement of the case; or two years after the order for relief." Therefore, this action has been commenced in a timely manner.

85. Defendant LBMC committed malpractice by failing to adhere to the standards of its profession in the course of its audits of Southeast Waffles.

86. These acts damaged the Company and caused it significant financial losses. Murphey is entitled to recover such damages from LBMC.

## VI. COUNT TWO: MURPHEY'S CLAIM FOR NEGLIGENCE

87. Murphey repeats and realleges the allegations in paragraphs 1-86 above.

88. Section 108(a) of the Bankruptcy Code provides that, if a statute of limitations has not expired prior to the date of the filing of the petition, that the trustee may commence such action before the later of the "end of such period, including any suspension of such period occurring on or after the commencement of the case; or two years after the order for relief." Therefore, this action has been commenced in a timely manner.

89. Defendant LBMC was grossly negligent or otherwise in conducting its audits of Southeast Waffles.

90. LBMC's gross negligence damaged the Company and caused it significant financial losses. Murphey is entitled to recover such damages from LBMC.

## VII. COUNT THREE: MURPHEY'S CLAIM FOR BREACH OF CONTRACT

91. Murphey repeats and realleges the allegations in paragraphs 1-90 above.

92. Section 108(a) of the Bankruptcy Code provides that, if a statute of limitations has not expired prior to the date of the filing of the petition, that the trustee may commence such action before the later of the "end of such period, including any suspension of such period occurring on or after the commencement of the case; or two years after the order for relief." Therefore, this action has been commenced in a timely manner.

93. LBMC breached its contract with Southeast Waffles in its performance of the audit and the resulting financial reporting.

94. LBMC's breach of contract damaged Southeast Waffles and caused it significant financial losses. Murphey is entitled to recover such damages from LBMC.

## VIII.  COUNT FOUR:  MURPHEY'S CLAIM FOR AIDING-AND-ABETTING

95. Murphey repeats and realleges the allegations in paragraphs 1-94 above.

96. Section 108(a) of the Bankruptcy Code provides that, if a statute of limitations has not expired prior to the date of the filing of the petition, that the trustee may commence such action before the later of the "end of such period, including any suspension of such period occurring on or after the commencement of the case; or two years after the order for relief." Therefore, this action has been commenced in a timely manner.

97. Sullivan breached her fiduciary duties to the Southeast Waffles by implementing and executing the check-kiting scheme, by refusing to remit trust fund taxes to the IRS, and by hiding the actual financial condition of the Southeast Waffles from its owners and creditors.

98. Defendant LBMC knew that Sullivan's conduct constituted a breach of her fiduciary duties and, through its grossly negligent audit techniques, gave substantial assistance or encouragement to Defendant Sullivan in this breach.

99. These acts damaged Southeast Waffles and caused significant financial losses. Murphey is entitled to recover such damages from LBMC.

## IX.  COUNT FIVE:  EZELL'S CLAIM FOR MALPRACTICE

100. Ezell repeats and realleges the allegations in paragraphs 1-99 above.

101. Ezell, as a member of the unsecured creditors' committee in Southeast Waffles' bankruptcy, entered a tolling agreement with LBMC on December 5, 2008 in which all applicable statutes of limitation were tolled until August 31, 2009. The underlying statutes of limitations, which resumed on August 31, 2009, have not lapsed. Therefore, this action has been commenced in a timely manner.

102. LBMC committed malpractice by failing to adhere to the standards of its profession in the course of its audits of the Company.

103. LBMC knew that Ezell relied on its audit opinion.

104. These acts damaged Southeast Waffles and its creditors and caused significant financial losses for them. Ezell is entitled to recover such damages from LBMC.

## X. COUNT SIX: EZELL'S CLAIM FOR NEGLIGENCE

105. Plaintiff repeats and realleges the allegations in paragraphs 1-104 above as if fully restated hereunder.

106. Ezell, as a member of the unsecured creditors' committee in Southeast Waffles' bankruptcy, entered a tolling agreement with LBMC on December 5, 2008 in which all applicable statutes of limitation were tolled until August 31, 2009. The underlying statutes of limitations, which resumed on August 31, 2009, have not lapsed. Therefore, this action has been commenced in a timely manner.

107. LBMC was grossly negligent or otherwise in the course of its audits of the Company.

108. LBMC knew that Ezell relied on its audit opinion.

109. These acts damaged Southeast Waffles and its creditors and caused significant financial losses for them. Ezell is entitled to recover such damages from LBMC.

## XI. COUNT SEVEN: EZELL'S CLAIM FOR AIDING-AND-ABETTING

110. Plaintiff repeats and realleges the allegations in paragraphs 1-109 above as if fully restated hereunder.

111. Ezell, as a member of the unsecured creditors' committee in Southeast Waffles' bankruptcy, entered a tolling agreement with LBMC on December 5, 2008 in which all applicable statutes of limitation were tolled until August 31, 2009. The underlying statutes of limitations, which resumed on August 31, 2009, have not lapsed. Therefore, this action has been commenced in a timely manner.

112. Sullivan breached her fiduciary duties to the Company by implementing and executing the check-kiting scheme, by refusing to remit trust fund taxes to the IRS, and by hiding the actual financial condition of Southeast Waffles from its owners and creditors.

113. As Southeast Waffles' financial problems grew worse, and entered the zone of insolvency, Sullivan not only owed a fiduciary duty to Southeast Waffles, but to its creditors as well.

114. Defendant LBMC knew of Sullivan's conduct constituted a breach of her fiduciary duties and, in its grossly negligent audit techniques, gave substantial assistance or encouragement to Defendant Sullivan in this breach.

115. LBMC knew that Ezell relied on its audit opinion.

116. These acts damaged Southeast Waffles and its creditors and caused significant financial losses for them. Ezell is entitled to recover such damages from LBMC.

## XII. COUNT EIGHT: PUNITIVE DAMAGES

117. Plaintiffs repeat and reallege the allegations in paragraphs 1-116 above.

118. LBMC knew that the Company was not paying trust fund taxes timely and that Sullivan was holding checks, which should have been sent to the IRS for remittance of trust fund taxes.

119. Even with this knowledge, LBMC accepted Sullivan's representations as true and intentionally did not proceed with further investigation.

120. LBMC intentionally did not request canceled checks from Sullivan to back up the reconciliations it received as "proof" that trust fund taxes were paid.

121. LBMC intentionally did not report this information to Shaub, even though it knew he was disconnected from the financial operations of the Company.

122. LBMC also knew that failure to remit trust fund taxes violated federal law.

123. LBMC acted intentionally and recklessly by failing to report this knowledge to Shaub, a "responsible party" for the trust fund taxes.

124. LBMC acted intentionally and recklessly by classifying the unpaid taxes as "checks written in excess of bank balance" instead of in the proper category.

125. LBMC acted intentionally and recklessly by issuing unqualified audit opinions on the financial statements of Southeast Waffles.

126. LBMC's audit opinions misled management of Southeast Waffles and its creditors, including Ezell.

127. These acts damaged the Company and caused significant financial losses. Murphey and Ezell are entitled to recover such damages from LBMC.

128. Punitive damages are appropriate in this case to punish LBMC for its willful blindness and to deter other members of the accounting profession who are in a position to detect and deter fraud, but instead choose to whitewash it.

129. Murphey and Ezell demand a trial by jury.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that they have the following relief:

A. That summons issue and that Defendant be properly served;

B. That judgment be granted for all damages, both special and general, flowing from Southeast Waffles' insolvency and costs of collection, including reasonable attorneys' fees, as Plaintiffs may prove at trial;

C. That judgment be granted for punitive damages;

D. That all costs be taxed against Defendant;

E. That interest accrue on the outstanding judgment at the highest amount allowed by law; and

F. That the Court grant such other and further relief as it deems just and equitable.

May 20, 2010

Respectfully submitted,

/s/ Thomas K. Potter, III

Thomas K. Potter, III, T.A. (BPR #24857)
Lawrence R. Ahern, III (BPR# 1677)
Alisa C. Peters (BPR #25634)
BURR & FORMAN LLP
700 Two American Center
3102 West End Avenue
Nashville, TN 37203
Telephone: (615) 724-3231
Facsimile: (615) 724-3331
Email: tpotter@burr.com
Email: lahern@burr.com
Email: apeters@burr.com

*Counsel for Plaintiffs*